Whitaker, Judge,
delivered tbe opinion of tbe court:
Plaintiff first enlisted in the United States Army, but shortly thereafter he was discharged in order to accept a commission as a Second Lieutenant in the Officers’ Reserve Corps. He was later promoted to First Lieutenant, National Army, in which he continued to serve until May 29, 1919, *312 when he was honorably discharged. Immediately thereafter, he was appointed First Lieutenant, Officers’ Reserve Corps, in which he continued to serve until August 24,1934, at which time his appointment as Captain in the Officers’ Reserve Corps expired. He was appointed Captain, Army of the United States, on January 9, 1943, and on June 2, 1947, he was appointed Major, Corps of Engineers, Officers’ Reserve Corps. On August 16, 1952, while still serving in the Army of the United States as a Captain, but holding a commission as Major, Officers’ Reserve Corps, he attained the age of 60 years. Under sections 301 and 302 of the Act of June 29, 1948 (62 Stat. § 1087; 10 U.S.C. § 1331, et seq.), an officer was entitled to retirement at the age of 60, if he had rendered satisfactory military service and complied with certain other conditions. It was found that plaintiff qualified for retirement under those sections, and he was retired on October 31, 1952. However, he now claims he was entitled to retirement for physical disability, and he sues for the difference in the disability retired pay, which he claims, and the retired pay received on account of his age and satisfactory military service.
The delay between August 16, 1952, when plaintiff arrived at the age of 60, and the date of his discharge on October 31, 1952, was occasioned by a recommendation of the Adjutant General that plaintiff be retained on duty until certain orthopedic examinations of him could be made, tie was sent to Walter Reed Army Hospital on August 21, 1952, where various examinations were made of him, but the doctors reported that no physical defects had been found which would disqualify him for relief from active duty.
Thereafter, plaintiff requested permission to appear before a Medical Board of Evaluation. He was sent before a Disposition Board, consisting of three medical officers, who found that plaintiff was qualified for overseas service, and recommended that he be separated, not for physical disability. This was done, as we have stated.
On October 31, 1952, plaintiff filed an application with the Army Board for Correction of Military Records requesting an amendment of his record to show that his release from active duty was by reason of physical disability. *313 The Army Board for Correction of Military Records requested the Army Physical Review Council to review plaintiff’s case and to make recommendations for its disposition. On January 20, 1954, the Review Council found that plaintiff’s physical condition did not warrant his appearance before a Physical Evaluation Board, or retirement for physical disability at the time of his separation from the service.
However, on March 5, 1954, the Secretary of the Army authorized plaintiff’s admission to Walter Reed Army Hospital for a complete medical examination, and for an appearance before a Medical Board and, if as a result thereof it appeared justified, for his appearance before a Physical Evaluation Board. He was admitted to the hospital on March 30, 1954, and was subjected to exhaustive examinations for a period of a month, after which a Medical Board made an exhaustive report, in which it was concluded “that he [plaintiff] was physically fit for military duty commensurate with his age, grade and branch of service at the time he was relieved from active duty.”
Following this, the Army Board for Correction of Military Records on May 27, 1954, notified plaintiff that it had examined his entire record and that its examination revealed no error or injustice in his separation from the service on October 31, 1952, not for physical disability, but by reason of his age.
There is ample evidence to support this finding. The only contrary evidence is the testimony of two private doctors who were of the opinion that plaintiff was disabled to perform military duty, by reason of skin cancers on his hands and osteoarthritis. Of course a man 60 years old is by no means as vigorous as a man 25 or 30. As age advances, a certain amount of arthritis is to be expected, and the Army of course does not call upon a man of this age to do the same things that a younger man would be called upon to do. The precancerous condition of his hands was not disabling. This condition readily responds to treatment, and by treatment it can be completely eradicated. Plaintiff had just arrived at that age where Congress thought a military man was eligible to retire with retired pay, whatever his condition; but he was not entitled to retirement for physical *314 disability. We think the testimony is clearly susceptible of the conclusion, as the Medical Board at Walter Need Army Hospital said, that plaintiff was “physically fit for military duty commensurate with his age, grade and branch of service at the time he was relieved from active duty.”
We agree with the Trial Commissioner that the evidence fails to establish arbitrary or capricious action by the Board or that its findings were clearly erroneous. As the defendant points out in its brief, section 414(a) of the Career Compensation Act of 1949 (63 Stat. 802, 825; 37 U.S.C. § 284(a), 1952 ed.), provides that the determination of the fitness of an officer for active service and the percentage of his disability at the time of separation is vested in the Secretary concerned. The Secretary has found plaintiff was not entitled to be discharged for physical disability, and since we think that his action was not arbitrary or capricious or clearly erroneous, that finding is conclusive.
It results that plaintiff’s petition must be dismissed.
It is so ordered.
Durfee, Judge; Laramoke, Judge; MaddeN, Judge; and JoNes, 0hief Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner C. Murray Bernhardt, and the briefs and argument of counsel, makes findings of fact as follows:
1. The plaintiff is a United States citizen residing in Florida. He was born on August 16, 1892. He enlisted in the United States Army on June 13,1917, and was honorably discharged on November 26, 1917, to accept a commission. He was commissioned a Second Lieutenant, Officers’ Reserve Corps, November 27, 1917; promoted to First Lieutenant, National Army, July 25,1918 (accepted July 27,1918); and honorably discharged May 29,1919. He was appointed First Lieutenant, Officers’ Reserve Corps, August 19, 1919, and served continuously in the Officers’ Reserve Corps until August 24,1934, at which time his appointment as a Captain in the Officers’ Reserve Corps expired. During this latter period he served on active duty from July 9,1924 to July 23, *315 1924. He was appointed Captain, Army of the United States, Jannary 9,1943. On June 2,1947, be was appointed Major, Corps of Engineers, Officers’ Reserve Corps, although he continued serving on active duty in the grade of Captain until September 14,1950, at which time he was appointed a Major in the Army of the United States. On October 31, 1952, he was placed on the Army of the United States Retired List in the grade of Major with entitlement to retirement pay from November 1,1952.
2. Plaintiff’s retirement was under the provisions of sections 301 and 302 of the Act of Congress approved June 29, 1948 (P.L. 810, 80th Congress, 62 Stat. 1087,10 U.S.C. 1331, et seg.), he having been found, upon application, to be eligible for such benefits by reason of age and satisfactory military service. He was not retired by reason of physical disability. He retains his commission as a Major in the Corps of Engineers, AUS, Retired, and has been paid retirement pay under Public Law 810, 80th Congress, supra, since the date of his retirement on October 31,1952.
3. In a 1932 application to the Veterans Administration for World War I disability allowances and compensation, the plaintiff listed his disabilities as comprising “teeth, stomach, rheumatism, eye and ear trouble, low blood pressure, nervousness, anemia”.
4. Plaintiff was medically examined for entrance on extended active duty by a Board of three medical officers on October 10, 1942, at Walter Reed Army Hospital and found physically qualified for military service. No significant medical history is disclosed on the Report of Physical Examination other than usual childhood diseases. His bones, joints and muscles were noted as “normal” and his posture as “good”. In connection with this examination a certificate dated October 19,1942, by the Chief of the Physical Examining Board at Walter Reed Army Hospital stated that plaintiff was “mentally and physically qualified for duties involving moderate physical exertion”, that he was “physicially suitable for the type of duty for which he is applying.”
5. Plaintiff was physically examined on March 27,1947, at MacDill Air Force Base. Notation was made of dermatitis on the dorsal surface of both hands. He was found to be *316 physically qualified on June 25, 1947, by the Office of the Surgeon General. It was noted that his posture was good.
6. On July 21, 1948, plaintiff was again physically examined at MacDill Air Force Base. His posture was described as good. He was found physically qualified with no defects noted.
7. On January 19,1950, the plaintiff was again examined at MacDill Air Force Base for the purpose of an overseas assignment, tie was found fit for general service.
8. In January and February 1950, while in a leave status prior to overseas service in Okinawa, plaintiff suffered an attack of influenza or bronchitis and was treated by a civilian physician in Georgia. Although ill, he proceeded to the Port of Embarkation at San Francisco, was treated there at the Dispensary and enroute to Okinawa via the Army Transport General Walker, as well as for several weeks after arriving in Okinawa. On October 1951, while on duty in Okinawa, the plaintiff was certified by the Byukyus Army Hospital as having been examined and found physically capable of performing duties commensurate with his rank and experience in his branch of service. At that time he was given a physical profile of P2, Ul, Ll, HI, E2, Si. See finding 28, infra, for description of the physical profile system.
9. In May 1952 the plaintiff was physically examined for separation from the service. In his report of medical history the plaintiff stated in substance as follows:
General health — apparently good. Skin disease on hands several years, aggravated now. Pains and stiffness leg joints past few months. Knee joints “pop”. Cramps in hands at times; recurrent pain right side back of neck. Dizziness past few months.
He also reported an episode of ear fungus in 1941-1942, with current occasional need for wax removal, and hip pains which were diagnosed as low grade gluteal bursitis bilaterally which was “self-limiting and should not lead to more than a 10% temporary disability extending for as long as six months.” On the occasion of this examination the plaintiff was found to be qualified for duty with no evidence of disability.
10. Although plaintiff was originally scheduled to report to Fort Myer, Virginia, not later than August 20, 1952, for *317 relief from active duty by reason of reaching statutory age of 60 on August 16,1952, the Adjutant General, in accordance with a recommendation of the Surgeon General, requested that plaintiff be retained on duty pending certain orthopedic examinations.
11. An orthopedic examination conducted at the Orthopedic Clinic, Walter Need Army Hospital, on August 21, 1952, disclosed the following:
This 60 year old white Major gives a history of chronic joint pains over the past two years. These have involved the shoulders, the hips, the lower back, and the neck. At the present time the patient’s chief difficulty seems to him to arise at the base of the neck posteriorly and is accompanied by an aching down into the arms and at times a tingling down into the arms. For several months he has also noted pain in the metatarsal-phalangeal and inter-phalangeal joints of the thumb of the left hand. The patient is at present up for retirement and is to be evaluated for the possibility of his difficulties on the basis of cervical arthritis or peripheral neuropathy.
Physical examination reveals a gentleman appearing to be the stated age of 60 with rather poor posture, the head being held forward between 30 and 45 degrees anterior to the normal. There is no limitation of motion of the neck. There is no limitation of motion of the shoulders, the elbows, the wrists, or the hands. Reflexes in both upper extremities are entirely normal and equal bilaterally. There is no hypesthesia or hyperesthesia to pin prick in the cervical region or in either upper extremity. There is mild paravertebral muscular spasm in the region of the vertebra prominens which would appear to be on the postural basis.
Review of x-rays reveals minimal osteoarthritic changes with lipping at the anterior margins of the bodies of the cervical vertebrae. The intervertebral foramina are well preserved and are not involved by this process. The intervertebral facets likewise appear to be free of this process at this time.
Impression: Osteoarthritis involving primarily the vertebrae and interphalangeal joints of the hands, minimal ; postural back strain, moderate.
Comments: While the patient’s difficulty causes him mild to moderate discomfort it has not incapacitated him for the performance of military duty to any appreciable degree. There is no specific joint limitation of *318 motion. There is no evidence of involvement of the nervous system. Instead he has just the early degenerative joint disease which one would expect in a man of this age.
The patient was advised that residence in a warm dry climate would probably make him more comfortable than residence in a cold damp climate. Heat and sali-cylates should give him relief of pain in the future. The patient was referred to Physical Medicine Section for postural training exercises which he can take on a home program following his retirement. It is not felt that sufficient disability exists from an orthopedic point of view to justify the man’s appearance before a Physical Evaluation Board. This is a very slow growing process and it is doubtful that there will be appreciable change in Iris present condition within the next five years.
12. In the course of the plaintiff’s examination at Walter Need Army Hospital on August 21, 1952, the Dermatology Clinic noted the following:
For approximately the past 10 years this patient has noted the appearance of scaly patches on the exposed surfaces of the backs of both hands. These have been asymptomatic as far as itching or pain is concerned. They have gradually progressed to the present time.
Examination today reveals multiple senile keratoses with marked scaling and some crusting present. The individual lesions range in size from y2 cm. to 1 y2 cm. in diameter.
Recommendations: (1) A punch biopsy obtained from one of the lesions for microscopic confirmation of diagnosis. (2) Electrodesiccation of the remaining lesions.
Impression: Senile keratoses of hands.
16 Sept. 52 Biopsy report confirms diagnosis of Senile Keratosis.
26 Sept. 52 Second biopsy taken 19 Sept. 52 shows sq. cell carcinoma left 4th finger.
13. On September 30, 1952, the Dermatology and Syphi-lology Section of Walter Need Army Hospital advised the Surgeon General as follows:
1. Major James McEaddy has been under treatment at the Dermatology Clinic since 21 August 1952. He was found to have Senile Keratoses on the backs of his hands. On 18 September one of the more active kera-toses on the back of the left fourth finger was excised. *319 Biopsy was reported as Squamous Cell Carcinoma. The carcinoma is considered to be completely treated.
2. Major McEaddy should be followed-up rather closely as his Senile Keratoses need to be treated. However, there is no emergency involved.
14. On October 6, 1952, the plaintiff requested that he be retained on active duty for the month of October 1952 for the purpose of obtaining dental treatment and further treatment of the skin condition on his hands. On October 8, 1952, the Adjutant General advised the Commanding Officer at Fort Myer, Virginia, that, upon review in the Department of the Army, the report of the plaintiff’s physical examination disclosed no physical defects disqualifying him for relief from active duty and stating that orders would be issued in sufficient time to relieve plaintiff from active duty effective October 31,1952.
15. On October 16, 1952, the plaintiff requested the Commanding General of Walter Keed Army Hospital for permission to appear before a Medical Board of Evaluation. By 1st Indorsement of October 17, 1952, to the said Commanding General, the plaintiff’s request was approved by Headquarters Fort Myer. However, no Medical Board of Evaluation was appointed prior to plaintiff’s retirement.
16. On a final type physical examination made on October 28, 1952, the plaintiff’s defects and diagnoses were summarized as follows:
Senile keratoses.
Vision 20/70 cc 20/20 0.17.
Osteo-arthritis.
Fungous infection of ears.
History of recent bursitis of hips.
It was found that the plaintiff was qualified for general service with waiver. He was given a physical profile of P3, TT3, L2, HI, E2, Si with a physical category of C. The physical profile system is described in All 40-105, pertinent parts of which are set forth in finding 28, infra.
17. A Disposition Board, consisting of three medical officers, convened on October 28, 1952, considered the clinical records, laboratory findings, and physical examination, and arrived at the following findings:
*320 1. Osteoarthritis involving vertebrae, interphalangeal joints of hands, and right knee, minimal. Postural back strain, moderate.
2. Senile keratoses.
Expressed in nontechnical language, these complaints consisted of stiffness of hands, right knee, and spine; senile skin changes, minimal, not incapacitating. The conditions were found to be partially permanently disabling, incident to service, not to have existed prior to entry on active duty, and not permanently aggravated by active duty. The plaintiff was found qualified for overseas service. The Board recommended that he be granted clearance for separation.
18. On October 31,1952, plaintiff was released from active duty not by reason of physical disability and placed on the Army of the United States Retired List in the grade of Major with entitlement to retirement pay from November 1, 1952, under the provisions of sections 801 and 302 of the Act of June 29,1948,62 Stat. 1087,10 U.S.C. 1331, et seq.
19. In an application dated October 31, 1952, filed with the Army Board for Correction of Military Records, the plaintiff requested that the orders relieving him from active duty be amended to show that his release from active duty was by reason of physical disability, citing the following reasons:
Protest is made concerning the form of “Relief from Active Duty Orders” and DD Form 214 for the following reasons:
It is my belief that the pain and discomfort presently existing was caused and/or aggravated by my present tour of active duty (EAD 16 Jany 1943 — separated 31 Oct. 1952; Feby 1950 thru July 1952 Overseas — Okinawa)
That the present claimed disability existed prior to 6 May 1952 (inpart) (seeincl. 1.)
That the Final type Physical Exam completed at Pentagon Dispensary on 24 October and 28 October, 1952 was made without access to the full clinical file at WRAH since I was at this time, and had been under active out-patient treatment at Dermatology Clinic during period 21 August 1952 to present date for a precancerous skin condition and anemia.
That my currently existing pain and discomfort— neck, left arm, lower back knees and hips — with con *321 stantly re-cnrring tingling in lower left arm and hand and occasional dizziness do in fact constitute a disability.
That the probable re-cnrrence of malignant conditions on both hands from time to time will necessitate further treatment and biopsis, according to the advice of Dermatology Clinic, WBAH. Since the first consultation at this clinic I have been treated as an out-patient on- an average of twice weekly. As of this date treated areas on both hands are not yet healed. Last consultation and treatment was on 30 October, 1952. It is believed that this condition may prove a continuing disability.
20. By letter dated November 12,1952, plaintiff furnished the Correction Board with a photograph of his hands taken on November 4,1952, and a copy of a report of physical examination conducted by Dr. F. D. Suttenfield, plaintiff’s private physician, dated November 11, 1952. Dr. Sutten-field’s report, after making findings based on his physical examination and commenting on alleged discrepancies in' the military reports, concluded with the following clinical impressions:
Clinical impressions:
1. Pre-cancerous and cancerous lesions of:
(a) One and/or both hands.
(b) Pernicious anemia is strongly suspected.
(e) Osteoarthritis, moderately advanced, involving the fifth and sixth cervical vertebrae and adjacent tissues.
In my opinion, Major McEaddy is totally disabled to perform either military or civilian Engineering and should be considered so until such time as his overall medical condition is thoroughly and completely evaluated and total management, including the proper medications, proper dietary regime, proper physiotherapy and _ rest regime, and such other measures as would be in the interest of Major McEaddy’s total health.
21. On January 20,1954, the Army Physical Keview Council, in response to a request for comment and opinion, advised the Army Board for Correction of Military Keeords that a review of medical records did not disclose any physical disability of such degree as to have warranted plaintiff’s appearance before a Physical Evaluation Board or retirement for *322 physical disability at the time of his separation from the service.
22. The Secretary of the Army under date of March 5, 1954, authorized plaintiff’s admission to Walter Eeed Army Hospital for a complete medical examination, appearance before a Medical Board and, if warranted, appearance before a Physical Evaluation Board in order to determine whether or not plaintiff was disabled as a result of his military service so as to be permanently incapacitated for active service upon his relief therefrom on October 31,1952.
23. Plaintiff was admitted to Walter Eeed Army Hospital on March 30, 1954, where he was subjected to exhaustive examinations and tests until his discharge therefrom on April 30, 1954. Laboratory tests included urinalyses, serology, hematology, blood chemistry, and gastric analysis. Examinations were conducted by the Neurophychiatric Service, Dermatology Clinic, Orthopedic Clinic, and Eye, Ear, Nose and Throat Clinics. Electrocardiograms were taken; the esophagus, stomach, and duodenum were fluoroscoped; X-rays were taken of the chest, lumbosacral spine, hips, knees, and of the cervical spine.
24. On May 6,1954, a Board of Medical Officers convened at Walter Eeed Army Hospital and made the following diagnosis:
Previous Personal History: This patient had had approximately 27 years of service, 12 active and 15 Ee-serve. He smoked about 1% packages of cigarettes per day and denied the use of any drugs except aspirin. His system review was essentially nonrevealing except for the systems mentioned in the history of the present illness.
History of Present Illness: This 61-year-old, white male was admitted to this hospital at the invitation of the Department of the Army in reference to a medical evaluation to determine whether or not the officer was disabled at the time of his relief from active service on 31 October 1952. In 1945 the patient developed episodes of indigestion and excessive gas formation, which symptoms had persisted off and on since then and had not been related to meals or types of food ingested. There was no accompanying nausea, vomiting, hematemesis, melena, diarrhea or other bowel disturbance. In early 1951 he developed low back pain *323 which was nonradiating and intermittent in nature until July 1952 when it became more severe. At that time he also developed pain in the neck and right shoulder. He had continued to have intermittent pain in the neck and right shoulder with stiffness of major joints, especially early in the morning, with increase in range of motion as the day and the patient’s activities progressed. In addition, he had complained of hoarseness of two or three years’ duration which he noted was more severe after excessive use of his voice. Finally, for the past two or three years the patient had had numerous senile keratotic lesions of both hands which had been treated at this hospital in 1952. Also, in 1952, a squamous cell carcinoma of the left fourth finger was removed by punch biopsy and electrodesiccation.
Physical Examination: The patient’s weight was 175 pounds; temperature, 98.6; pulse, 76 and regular; blood pressure, 138/84. He was a well developed, well nourished, somewhat depressed appearing, healthy white male in no acute or chronic distress. Examination of the eyes showed only minimal generalized arteriolar narrowing. Conversational hearing was only fair. Examination of the nose, mouth and throat was not remarkable. The chest was of normal contour, respiratorial excursions were bilaterally adequate and equal, and the lungs were clear to auscultation and percussion. The heart showed a normal sinus rhythm with no cardiac enlargement and no murmurs were heard. The abdomen was soft, slightly obese and nontender. No organs or masses were palpable. Examination of the prostate, genitalia and rectum was normal. His skin showed multiple senile keratotic lesions over the dorsum of both hands and an eczema-toid dermatitic type lesion involving the palmar surface and thumb of the right hand. The joints showed crepitations in both knees with no limitation of motion. The remainder of the physical examination was essentially within normal limits.
Laboratory Findings: WBC, differential count, NBC, hemoglobin and hematocrit were within normal limits. Corrected sedimentation rate was 22 mm. per hour. Urinalysis: Specific gravity, 1.011; sugar, negative; albumin, negative; microscopic and sedimentation, not remarkable. Cardiolipin flocculation test was negative. Serum uric acid was 5.2 mg. %. A histamine gastric analysis test revealed a fasting total acidity *324 of 22 with 4% free hydrochloric acid. The remainder of the values showed total acidity ranging from 20 to 22% and free hydrochloric acid ranging from 5 to 6%. X-ray of the chest demonstrated evidence of mild emphysematous changes of both lung fields with no evidence of chronic inflammatory disease. There was mild unfolding and tortuosity of the thoracic aorta; otherwise, the chest film was not remarkable. Upper GI series showed no evidence of pathology. X-ray of the spine, hips? knees, ankles and shoulders showed minimal generalized osteoarthritis with moderate osteoarthritis of C5 and C6. Electrocardiogram was within normal limits.
Consultations: Ear, nose and throat consultation revealed an impression of deafness, perceptive type, bilateral, mild, cause undetermined. Hearing: AS, 15 db; AD, 22 db. Speech reception score: AS, 23 db; AD, 23 db. Adjusted speech reception score: AS, 25; AD, 26. The consultant recommended that no aural rehabilitation was necessary, hearing clearance was granted, and the patient was given a profile of H-3. Dermatology consultations on two occasions during hospitalization supported the impression of multiple senile keratoses over the dorsa of both hands, and these were treated with liquid nitrogen and the use of neomycin ointment. A small patch of eczematoid dermatitis was present over the palmar surface and thumb of the right hand. Scrapings for fungi from this area were negative, and the patient was advised to avoid the use of soap in the involved area and to use local 3% vioform ointment. He was given the usual precautions about avoiding direct exposure to sunlight in reference to his keratotic lesions. Examinations did not reveal any evidence of recurrence of the basal cell carcinoma removed in 1952 and the dermatologist was of the opinion that skin biopsy was not indicated at this time. Orthopedic consultation, at which time the consultant examined the patient, elicited mild crepitation in both knees and no evidence of decreased range of motion in any of the major joints. There was also no evidence of atrophic changes in the muscles of the thighs, legs, arms, forearms and intrinsic muscles of the hands. It was the consultant’s impression that the patient had degenerative joint disease, mild, generalized, involving the cervical, thoracic and lumbosacral spine, and that the patient was physically fit for duty at the the time of his separation *325 from the service from an orthopedic standpoint. It was also felt that the amount of degenerative joint disease which the patient demonstrated was certainly commensurate with his age. Neuropsychiatric consultation did not reveal any evidence of overt psychosis or psychoneurosis although it was the examiner’s opinion that there probably was a psychogenic component to the patient’s complaints.
Course in the Hospital: This patient’s hospital course was characterized mainly by the diagnostic procedures and the consultations previously mentioned. He continued to have multiple system complaints of a minor degree throughout his hospital stay. These complaints were referable mainly to the musculoskeletal and gastrointestinal systems. It is the opinion of the Chief of General Medicine Service No. 1 that the patient has received maximum benefits of hospitalization and that he was physically fit for military duty commensurate with his age, grade and branch of service at the time that he was relieved from active duty.
25. On May 27,1954, plaintiff was advised that the Army Board for Correction of Military Eecords had examined his military, medical and Veterans Administration records, together with the information submitted by plaintiff, and that such examination failed to reveal any evidence of error or injustice relative to his separation from active duty on October 31, 1952, not by reason of physical disability; and that the Board concluded that there was no justification for a formal hearing and review of the case.
26. Plaintiff was physically examined by Veterans Administration on February 2,1953, and rated as follows:
7806 Eczematoid Dermatitis, Severe, Hands, Neck, and Chin — 30% from 11/1/52.
5003 Arthritis, Multiple Joints — 20% from 11/1/52.
Combined Eating: 40% from 11/1/52.
Veterans Administration rating sheet specifically noted thereon the plaintiff’s claimed “fungus infection ears not found on last examination 2/2/53” and that the “residuals of pneumonia and stomach trouble claimed by veteran not shown by the evidence of record”. Plaintiff made no claim with Veterans Administration as regards his hearing. The examination of plaintiff’s hearing by Veterans Administra *326 tion was recorded in feet before correction as “K (CY) 15: L (CY) 15”.
27. a. The plaintiff contends that he was unfit for military service at the time of his release from active duty on October 31,1952, because of the following conditions:
Arthritis of the cervical, thoracic and lumbosacral spine and hands.
Cancerous and precancerous lesions of the hands and neck.
Anemia.
Fungus infection of both ears.
Deafness.
Gastro-enteritis.
Bursitis of the hips.
b. As to the first of these foregoing ailments, namely, arthritis, the plaintiff contends that it originated traumatically with a fall from a top bunk on the troop transport carrying him to Okinawa in 1950, and was aggravated during his tour of duty there by frequent exposure to inclement weather and frequent travel by jeep over rough roads while discharging his duties as an engineer officer. The incidents themselves are established by the record, but it was not established that the defendant was arbitrary or capricious or clearly erroneous in determining plaintiff’s arthritic condition to be the product of a degenerative disease commensurate with plaintiff’s age and not disqualifying him from military duty commensurate with his age, grade and branch of service. Medical experts called as witnesses by the respective parties differed as to whether plaintiff’s arthritic condition was caused by plaintiff’s fall in 1950 and the conditions of his service in Okinawa in 1950-1952, but it was not established that the defendant was arbitrary, capricious or clearly erroneous in finding no causative relationship to have existed.
c. As to the cancerous and pre-cancerous lesions in plaintiff’s hands and neck, it was not established that the defendant was arbitrary, capricious or clearly erroneous in determining these to be nondisabling, although the condition would require plaintiff to wear gloves at times and to shelter himself from direct sunlight either by means of wearing gloves and shielding headgear or by remaining indoors to avoid exposure.
*327 d. None of the ailments listed in paragraph a of this finding was independently disabling so as to disqualify plaintiff from active duty. The Army does not as a matter of course consider the collective impact of a number of subdisabling conditions and automatically determine degrees of disability by arithmetical methods as does the Veterans Administration under its disability compensation program. In other words, although the Army considers the whole man, if the applicant suffers from a number of complaints, none of which is independently disabling, it would be most unusual for bim to be considered collectively disabled by adding up the individual complaints.
28. Pertinent Army Regulations provide as follows:
*AR 40-105
Department of the Army Washington 25, D.C., 9 January 1952
Standards of Physical Examination for Commission or Warrant in Regular Army, National Guard of the United States, Army of the United States, and Organized Reserve Corps
:]« sj« % :J«
SECTION n
PHYSICAL PROEILE SERIAL
6. General. — a. The physical profile serial is a system for indicating, in a simple and graphic maimer, the total functional ability of an individual to perform military duties and not the sum of the various anatomical defects that the individual may happen to exhibit. Since the analysis of an individual’s physical and mental status plays an important role in his military assignment and future welfare, clear and accurate descriptions of his physical and mental conditions are essential, and the functional grading must be executed with great care.
b. In the physical profile serial system, the human functions are considered under six factors and each factor is designated by a letter of the alphabet. These six letters are in order “PULHES.” The significance of the respective letters in the system is as follows:
*328 (1) “P” Physique. — This factor concerns general physical capacity or stamina and takes into account such considerations as age, build, strength, endurance, height, weight, agility,. energy, and muscular coordination. Also considered.under this factor are organic defects and diseases which would affect general physical capacity, and all organic defects or diseases that do not fall under other factors of this system.
(2) “U” Offer extremities. — This factor concerns the functional use of the hands, arms, shoulder girdle, and spine (cervical, thoracic, and upper lumbar) in regard to strength, range of motion, and general efficiency.
(3) “L” Lower extremities. — This factor concerns the functional use of the feet, legs, pelvic girdle, lower back musculature, and lower spine (lower lumbar and sacral) in regard to strength, range of motion, and general efficiency.
(4) “H” Hearing and ear defeats. — This factor concerns auditory acuity and diseases and defects of the ear.
(5) “E” Eyes. — This factor concerns visual acuity and diseases and defects of the eye.
(6) “S” Neuropsyohiatrie. — This factor concerns personality, emotional stability, and psychiatric and neurological diseases and defects, including history thereof.
c. Each of the factors represented by the letters “PULHES” is considered separately and is given a separate grade. Under each letter, the individual is graded on a numerical scale from one to four according to his functional ability in that factor. Number 1 represents above average efficiency with a minimal physical defect or no physical defect at'all; number 2 represents average efficiency with a mild nonprogressive physical defect; number 3 represents below average efficiency with a moderate physical defect (borderline); number 4 represents nonacceptable efficiency with a marked physical defect. For example, an individual with 20/20 vision would receive the grade of 1 under the letter “E”. An individual with active tuberculosis would receive a grade of 4 under letter “P”, etc.
d. In certain instances, more specific information will be rendered by adding a code letter as a suffix to the profile serial. These code letters are—
*329 (1) “R”. — Indicates a defect which is remediable by corrective treatment and which does not prevent the utilization of the individual for military duty. Correction of the defect would improve the general health and welfare of the individual although he is acceptable even with the defect present. Correction of the defect may or may not result in a change of the individual’s profile.
(2) “T”. — Indicates a defect which is temporary in nature and which, though it might be disqualifying if it persisted, could be so corrected by treatment that the individual would be physically qualified. In this instance, correction of the defect would change the individual’s profile.
(3) “D”. — Indicates a defect which, under SR 600-115-1, is permanently disqualifying for oversea service.
e. When the physical profile has been completed, a sequence of six numbers or number-letter combinations will be obtained. To facilitate assignment of individuals after they have been given a profile, a code known as the “physical category” has been adopted to identify various types of profiles. The letters “A”, “B”, “C”, and “E” are used to represent certain combinations of numbers in the profile. The code is as follows:
(1) “A” — a profile serial of 111111.
(2) “B” — a profile in which 2 is the lowest number in the profile (e.g., 222121).
(3) “C” — a profile in which 3 is the lowest number in the profile (e.g., 213211).
(4) “E” — a profile in which 4 is the lowest number in the profile (e.g., 411214).
f. An individual with an “A” or a “B” type category (i.e., any profile serial in which all numbers are 1 or 2) is considered acceptable for military service, except that personnel of the Women’s Army Corps require to have numeral “1” under the “S” factor. An individual with a “C” type category is considered acceptable for military service, but, because of his (her) physical defect, may require some assignment consideration within his (her) unit (command function). An “E” type category (i.e., any profile serial containing the number 4) is considered nonacceptable.
*330 *AE 40-680
Department of the Army Washington 25, D.C., 7 April 1952
MEDICAL SERVICE
LENGTH OE HOSPITALIZATION AND DISPOSITION OP PATIENTS
*****
3. Application of terms. — a. Effective. — The term “effective” describes those members who are capable of efficiently performing the duties of their office, rank, grade, or rating. For the purposes of these regulations, this includes members who are both medically and administratively fit for duty:
(1) “Medically fit” and “medical fitness” describe the condition of those persons who are not inhibited in the efficient performance of duties included within the scope of their office, rank, grade, or rating by the presence of mental or physical disabilities. Physical standards for Army personnel are prescribed in Alt 40-100, AE 40-105, and AE 40-115. The standards established in those regulations will be liberally interpreted in the determination of an individual’s medical fitness for retention on active duty. Members may be found qualified for retention on active duty even though they have diseases, injuries, or infirmities which would disqualify them for original appointment or enlistment; provided that such diseases, injuries, or infirmities are—
(a) Of such nature and degree as not to affect adversely the performance of continued active duty, considering the member’s age, grade, branch, and normal duties.
(b) Not subject to complications or serious aggravation by reason of continued active duty.
* * * * *
b. Noneffective. — The term “noneffective” includes those individuals who are incapable of efficiently performing the duties of their office, rank, grade, or rating. For the purposes of these regulations, “noneffectives” are *331 divided into two categories, those who are medically unfit, and those who are administratively unfit.
(1) “Medical unfitness” and “medically unfit” describe the condition of those members who have a physical or mental disability, not of a transitory nature, which impairs their ability to perform efficiently those duties included within the scope of their office, rank, grade, or rating in an active duty status, or is of such a nature as to make further disability or injury a reasonably foreseeable result of their continuance on active duty.
SR 40-120-1
Department of the Army Washington 25, D.C., 9 October 1953
MEDICAL SERVICE
MEDICAL STANDARDS OE EITNESS AND UNFITNESS FOR RETENTION ON ACTIVE DUTY
* * *
SECTION I
PRELIMINARY
$ H* ‡ $ H*
b. The purpose of these medical standards as to fitness and unfitness is to secure the maximum efficiency and uniformity in the determination of disabilities which warrant disability separation or retirement or warrant retention in the military service. Medical examiners should consider these standards as a guide with discretion and not construe them too strictly or arbitrarily, the object being to aid in the determination of whether or not an individual is qualified for further military service. Every case must be considered on its individual merits and the decision of fitness or unfitness based on a consideration of pertinent directives and accepted medical principles.
2. Evaluation of physical defects. — a. In evaluating physical disabilities, due regard will be given to the physical standards set forth in AR 40-100, AR 40-105, and AR 40-115. However, these directives will not be as strictly interpreted as for appointment or entrance on active duty (par. 4, SR 600-450-5). Appropriate consideration will be given to a record of satisfactory performance of general service over a reasonable period of time, and the individual’s age, grade, branch of service, and normal duties. A finding of physical fitness is *332 appropriate when, any physical disability which may be present will not interfere with satisfactory performance of duty, or is not subject to complications or serious aggravation by reason of continued military duty. No individual will be found fit for service unless he is physically capable of performing duties of his office, rank, grade, or rating.
* # * * *
SECTION m
EARS
8. Defective hearing. — Deafness does not alter a patient’s medical fitness for retention on active duty when the patient’s hearing can be sufficiently improved through rehabilitation and use of a hearing aid to meet the medical fitness standards prescribed for retention on active duty. No Army member will be considered physically unfit for retention on active duty solely because of hearing defect, provided such defect can be improved by use of hearing aid to a loss of 20 decibels or less in speech reception score. * * *.
*****
SECTION IV
GENERAL EXAMINATION
Hi * * * *
17. Malignant growths.- — Malignant growths considered to have been entirely removed without evidence of metastasia are not sufficient reason for finding an individual unfit. However, exceptions should be made if the residuals of the remedial treatment, in themselves, render the individual unfit.
section xm
SPINE AND PELVIS, INCLUDING SACR0-ILIAC AND LUMB0-SACRAL JOINTS
65. Arthritis. — a. Arthritis, if relatively asymptomatic, is usually not considered to render an individual unfit.
b. Osteoarthritis originating prior to entry on active duty is considered to have been permanently aggravated by the service only when there is a history of some definite pertinent local injury or an abrupt and sudden pathological development during active service or where there has been undue exertion, exposure, or other adverse influences of the military service, such that the *333 progression of the disease has been definitely permanently accelerated. If the osteoarthritis originated in the service, it must be at least moderate in degree, both objectively and subjectively, to be considered as rendering the individual unfit.
% :J: % %
75. Bursitis and myositis. — Bursitis and myositis are not considered to render an individual unfit.
*SR 600-450-1
Department of the Army Washington 25, D.C., 7 November 1949
PERSONNEL
PHYSICAL evaluation; hospitalization; disposition; SEPARATION EOR PHYSICAL REASONS
* * * * *
SECTION HI
MEDICAL BOARD PROCEDURE
9. Medical board action. * * * When the medical board has confirmed the fact that the patient requires no further observation and treatment at a military hospital, upon proper findings, the medical board, located as indicated, will make appropriate recommendations for disposition as follows:
a. By medical boards located at hospitals having physical evaluation board authority.
(1) Return to duty.
# % % & ^
11. Approving authority. — * * * If the hospital commander approves the recommendation of the medical board, he will proceed as indicated in paragraph ‡ í» ‡
12. Disposition of patient following appearance before medical board. — Subsequent to appearance of patient before the medical board, the appropriate action as indicated below will be taken by the hospital commander or the commanding officer of the station at which the hospital is located.
_ a. When the approved recommendation for disposition of a patient is for his return to duty (or separation from the service, as provided in paragraphs 9a (1), (2), *334 or (6),andb (1), (2), or (6), he will be returned to duty and/or reported for assignment in accordance with existing instructions (see SR 600-145-11), or if eligible, processed for separation. * * *.
*****
(c) When the approved recommendation is for appearance before a physical evaluation board (par. 9a (4)), the hospital commander will order the patient before such a board.
*SR 600-450-5
Department of the Army Washington 25, D.C., 12 July 1951
PERSONNEL
EVALUATION AND SEPARATION EOR PHYSICAL DISABILITY
# # * ❖ #
SECTION in
PHYSICAL EVALUATION BOARDS
7. To whom applicable. — Whenever it appears that a member, other than a member to be separated under SR 615-360-40, may be medically unfit for active duty, his case will be referred to a physical evaluation board for disposition under these regulations. * * *.
CONCLUSION OE LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is not entitled to recover and his petition is dismissed.

 Til ese regulations supersede Alt 40-105, 29 October 1946, including C 2, 3 January 1951.

 These regulations supersede AR 40-680, 15 February 1951; SR 40-10-5, 16 June 1949, Including C 1, 80 June 1949; WCL 35874, 1 February 1950; WCL 27297, 17 November 1950; WCL 36642, 5 January 1951; and together with SR 600-450-5, 12 July 1951, supersede SR 600-450-1, 7 November 1949.

 These regulations supersede SR 605-240-1, 19 May 1949; chapter 2, TM 12-238, 1 January 1945, including so much of C 1, IT January 1946, and C 2, 1 June 1946, as pertains to chapter 2; and TM 12-245, 1 October 1945, Including C 1, 30 November 1945.

 These regulations supersede paragraphs 1, 2, 3a, and d, 4, 5, 6a, and f, 7, sections IV, V, VI, and VII, SR 609-450-1, 7 November 1049; SR 600-450-2, 28 June 1950; SR 600-450-3, 10 October 1950; WCL 33980, 21 December 1950; and DA message 38986, 27 April 1951.